NEW ORLEANS EMPLOYERS IN-
TERNATIONAL LONGSHORE-
MEN'S ASSOCIATION, AFL–CIO
PENSION FUND and Joseph High-
tower, as a trustee and on behalf of
the New Orleans Employers Interna-
tional Longshoremen's Association,
AFL–CIO Pension Fund, Plaintiffs,

v.

MERCER INVESTMENT CONSUL-
TANTS, John M. Dickson and Mi-
chael S. Haley, Defendants.

Civil Action No. 1:06–CV–2822–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 25, 2009.

Brian Petruska, Jeffrey S. Swyers, Marc Harold Rifkind, Slevin & Hart, Washington, DC, Harry J. Winograd, Jessica J. Harper, Bodker Ramsey Andrews Winograd & Wildstein, Atlanta, GA, for Plaintiffs.

John Timothy McDonald, Richard H. Sinkfield, Thomas J. Mew, IV, Rogers & Hardin, Atlanta, GA, for Defendants.

## *ORDER*

ORINDA D. EVANS, District Judge.

This Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, case is before the Court for findings of fact and conclusions of law following a bench trial on November 10–19, 2008. Plaintiffs allege that Defendants Mercer Investment Consultants and Michael Haley[1] breached their fiduciary duty to the Longshoremen's Pension Fund. Specifically, Plaintiffs claim that Defendants failed to timely recommend the termination of one of the Fund's investment managers. Plaintiffs contend that if Defendants had exercised appropriate diligence they would have recommended the investment manager's termination in May 2001, after receiving data for the quarter ending March 31, 2001. Alternatively, Plaintiffs claim a termination recommendation should have been made no later than May 2002, after receiving data for the quarter ending March 31, 2002. Implicit in Plaintiffs' claim is that Defendants should have recommended a new investment manager who would have made better, more prudent investment choices for the Pension Fund. Defendants maintain that failure to recommend termination before August 2002 was not imprudent. Plaintiffs seek to recover

---

1. At trial the parties agreed that the only remaining claim for trial—breach of fiduciary duty—should be dismissed as to Defendant Dickson. *See* [Trial Trans. Vol. IV at 714–15 (Plaintiffs' counsel) ]. This claim is dismissed with prejudice as to Dickson.

the damages allegedly stemming from Defendants' inaction, in the sum of $8,745,800.

For the reasons set forth below, the Court concludes that Defendants' failure to recommend earlier termination was not a breach of their fiduciary duty to Plaintiffs under ERISA. Noting that this case was filed on November 22, 2006, the Court also concludes that Plaintiffs' claim is barred by the three-year ERISA statute of limitations. Both parties have filed post-trial briefs [Docs. # 223 and # 224], which have been considered along with the evidence and arguments presented by the parties, and the parties' other submissions. The Court makes the following findings of fact and conclusions of law.

## I. *Findings of Fact*

Plaintiff New Orleans Employers International Longshoremen's Association, AFL–CIO Pension Fund ("Pension Fund") was founded on May 10, 1957. [Doc. # 191–4 at ¶ 1]. The Pension Fund is a Taft–Hartley joint labor-management defined benefit pension plan. *Id.* at ¶¶ 2, 7. The employers and participants in the Pension Fund are involved in the industry of loading and unloading cargo at the docks of New Orleans and Baton Rouge. *Id.* at ¶ 1. The purpose of the Pension Fund is to provide qualified employees with a lifetime monthly annuity payment. *Id.* at ¶ 3. The amount of the monthly payment depends on the employee's years of service; employees with more years of service are entitled to a higher monthly payment. *Id.*

The operation and management of the Pension Fund is governed by its Trust Agreement. *Id.* at ¶ 4. The Pension Fund is managed by Trustees, with an equal number representing labor and management. *Id.* at ¶ 7. The Trustees have the discretionary authority to decide how to invest the Fund's assets. *Id.* at ¶ 8. In order to manage the Fund's assets, the Board of Trustees hires investment managers. *Id.* These investment managers invest the Fund's assets in specific asset classes denominated by the Trustees. *Id.* at ¶ 9. The Board of Trustees also retains an investment consultant (in this case, Defendant Mercer Investment Consultants) to monitor the investment managers' performance on behalf of the Pension Fund and to keep the Trustees of the Pension Fund advised of their progress. *Id.* at ¶ 8, 12. The investment consultant does not act as advisor to the investment managers; only to the Pension Fund.

Plaintiffs Joseph Hightower and Walter Ohler are current Trustees of the Pension Fund. *Id.* at ¶¶ 5, 6. Neither Plaintiff was a Trustee at the time of the events that are at issue in this case. *Id.*

Defendant Mercer Investment Consulting, Inc. ("Mercer") was the Pension Fund's investment consultant from approximately November 1994 through approximately October 2003. [Doc. # 191–4 at ¶ 11]; [Defs.' Exh. 1]; *see* [Defs' Exhs. 95, 96]. Initially, Defendant John Dickson ("Dickson") handled the Pension Fund account as Mercer's representative. *Id.* at ¶ 14. When Dickson left Mercer in March 2001, Defendant Michael Haley ("Haley") took over the Pension Fund account. *Id.* Haley left Mercer in 2005 and went to work for an investment manager. [Trial Trans. Vol. VI at 864, 866 (Testimony of Michael Haley)].

Harris Bretall Sullivan and Smith ("Harris Bretall") was one of the Pension Fund's investment managers from 1992 until October 2002. Its tenure with the Pension Fund predated Mercer's hiring in 1994. Harris Bretall managed the Pension Fund's Large Cap Growth Equity fund, making independent decisions as to which large cap growth securities to buy, sell, or maintain in the portfolio. The Pension Fund terminated Harris Bretall's services

based on Mercer's August 2002 recommendation.

*Diversification of the Pension Fund Portfolio*

The Fund's investments were governed by an Investment Policy Statement adopted by the Trustees. Mercer assisted the Pension Fund in preparing the relevant Investment Policy Statement in 1998.[2] [Trial Trans. Vol. V at 744 (Testimony of John Dickson)]. It called for investment in assets that were "properly diversified to reduce the potential of a single security or single sector of securities having a disproportionate or significant impact on the portfolio." [Pls.' Exhs. 5 at 4, 6 at 4]. In that manner, when one group under-performs, another may be outperforming. [Trial Trans. Vol. VI at 937 (Testimony of Michael Haley)]. During the relevant time frame the Fund's assets were divided into various investment classes, most of which were equity classifications, with some being fixed income [Pls.' Exh. 6 at 3], as follows:

| Security Class | Strategic Target |
| --- | --- |
| **Equity** | 60.0% |
| Large–Cap Core Equity | 10.0% |
| Large–Cap Value Equity | 12.5% |
| Large–Cap Growth Equity | 12.5% |
| Passive Large–Cap Equity | 10.0% |
| Mid–Cap Equity | 10.0% |
| International Equity | 5.0% |
| **U.S. Fixed Income** | 40.0% |
| Active Fixed Income | 20.0% |
| Passive Fixed Income | 20.0% |
| **Total Fund** | 100.00% |

The Pension Fund hired a separate investment manager for each security class.

The Investment Policy Statement contained a "strategy" and an "equity diversification requirement" for each security class. For the large cap growth manager the stated "strategy" was:

This is an active large-capitalization, growth equity strategy designed primarily to provide capital appreciation with current income as a secondary consideration. The actual selection criteria used shall be at the discretion of the investment manager.

[Defs.' Exh. 119 at 11].

Within the large cap growth manager group whose work Mercer reviewed for various clients, there existed a range of investment strategies, with some being more conservative than others. [Trial Trans. Vol. VI at 911 (Testimony of Michael Haley)]. Except as specifically stated, the Investment Policy Statement did not restrict the choice of large cap growth investment managers to managers with a particular investment strategy.

The "equity diversification" requirement for the large cap growth portfolio was:

The portfolio's allocation to the securities of any one issuer is limited to 5% at market. No quantitative guidelines are given as to industry diversification; however, the investment manager is expected to develop and apply prudent standards.

[Defs.' Exh. 119 at 11].

The Investment Policy Statement specifically prohibited purchasing certain types of high-risk securities—*e.g.* futures, commodities. It prohibited margin buying and short sales. None of these types of purchases are implicated in this lawsuit.

The Court finds that the Pension Fund's overall portfolio during the time relevant to this lawsuit was very well diversified. Further, the selected security classes and the relative division of assets between the various classes were common for pension funds. [Trial Trans. Vol. VI at 1064–65 (Testimony of Robert Penter)]. Across the various equity investment classes the portfolio held approximately a thousand different securities. [Trial Trans. Vol. VI at 880 (Testimony of Michael Haley)]. Plaintiffs have made no claim that Harris

---

**2.** The Investment Policy Statement was modified in 2001 but the performance standards for the Large–Cap Growth fund remained the same. [Doc. # 191–4 at ¶ 21].

Bretall's portfolio violated the diversification standard of the Investment Policy Statement.

*Benchmarks for the Large Cap Growth Fund*

The 1998 investment Policy Statement established well-defined benchmarks for each of the Pension Fund's security classes [Doc. # 191–4 at ¶ 19]. The benchmarks reflected the Pension Fund's definition of an acceptable rate of return on its investments in each class. Both Mercer and the investment managers were aware of the benchmarks. Each investment manager was required to acknowledge the Statement by signing a copy. *Id.* at ¶¶ 18, 19. However, there was no contractual commitment to the Pension Fund by Mercer or the managers that the benchmarks would be reached. Further, any of the parties could discontinue their relationship at any time for any reason.

The Large Cap Growth fund, managed by Harris Bretall, was subject to the following benchmarks:

Rate of Return Expectations

Over all three year periods, the portfolio will be expected to achieve the following:

- Outperform the return of the S & P Growth Index, net of fees.
- Provide a rate of return which ranks above the median in Mercer Investment Consulting, Inc.'s Large–Capitalization Growth Manager Universe.

*Id.* at ¶ 20.

The S & P Growth Index reports data for growth stocks[3] which are listed in the Standard and Poor's 500, a proprietary list of large corporation stocks selected by Standard and Poor's ("S & P") for inclusion, on a periodic basis. Dictionary of Finance and Investment Terms 670 (7th ed.2006). Over 90% of the 500 stocks are considered "large capitalization" or "large cap" (the rest are "mid cap"); at any given time half of them are "growth equity" as opposed to "value equity" (the remaining half). The index is weighted in that the larger a company's capitalization, the more it counts in the index. Also, sector representation (*e.g.,* financials, technology) in the index varies from time to time as determined by Standard & Poor's. *See* Standard & Poor's, S & P 500 Factsheet at 1 (March 31, 2009), *available at* http://www2.standardandpoors.com/spf/pdf/index/SP_500_Factsheet.pdf; MSCI Barra S & P/Barra Indexes, Description http://www.mscibarra.com/products/indices/snp/description3.jsp (last visited May 6, 2009). S & P publishes closing prices for the S & P 500 Index each day and also publishes percentages representing the amount of positive or negative change from the previous day. *See* MSCI Barra S & P/Barra Indexes, Description http://www.mscibarra.com/products/indices/snp/index.jsp (last visited May 6, 2009). The S & P Growth Index provides aggregate percentage of change data for S & P 500 growth stocks over whatever period of time is of interest. *See id.* Therefore, saying for example that the S & P Growth Index "returned" 5% over a certain period of time means that the price of the "growth" stocks in the S & P 500 increased in the aggregate by 5% during that time. Returns for one year or more are reported as annualized figures. *See* Standard &

---

**3.** Growth stocks are shares in companies whose earnings usually have a relatively high appreciation in value over time. Black's Law Dictionary 1429 (7th ed.1999). Because these companies typically reinvest their income back into their organizations, growth stocks usually pay low dividends. *Id.* In contrast, "Value stocks" typically pay high dividends and trade at a lower price relative to their dividends and earnings. *See* Dictionary of Finance and Investment Terms 776 (7th ed.2006). A well-diversified investment portfolio contains both growth and value stocks. [Trial Trans. Vol. V at 747–48 (Testimony of John Dickson); Vol. VII at 1090–91 (Testimony of Robert Penter) ].

Poor's, S & P 500 Factsheet at 2 (March 31, 2009), *available at* http://www2.standardandpoors.com/spf/pdf/index/SP_500_Factsheet.pdf.

The term "Mercer Large Capitalization Growth Manager Universe" refers to an in-house list of such managers which Mercer created, using the names of some of those Large–Cap Growth managers whose work Mercer reviewed as investment consultant to various clients. [Trial Trans. Vol. V at 752–53 (Testimony of John Dickson)]. Apparently, the list was comprised of approximately 200 such large cap growth investment managers. [Trial Trans. Vol, III at 323–24 (Testimony of Gerald Clarke)]. No companies are specifically identified in the record. Mercer as investment consultant had access to information on the rates of return achieved by each of the large cap growth managers whose work it reviewed; it ranked them in descending order based on rate of return, from high to low to create the Mercer Large Cap Growth Manager Universe. *Id.* at 330–31 (Clarke). The rankings were recalculated each quarter. The lowest performers were periodically replaced, probably each quarter. *See* [Trial Trans. Vol. V at 752–53 (Testimony of John Dickson)]. The quarterly reports prepared by Mercer provided information on the performance of Harris Bretall in relation to the other managers in the Mercer Large Cap Growth Universe and in relation to the mid-point of all returns in the Universe. *See, e.g.,* Pls' Exh. 9 at 20.

The returns of individual large cap growth managers varied considerably from one quarter to the next. The Court credits Haley's testimony that there was not a manager whose returns had been consistently in the top quartile of reported re-

turns. [Trial Trans. Vol. VI at 891 (Testimony of Michael Haley)].

*Mercer's Internal Manager Ratings and Research Priority Indicator*

Mercer had a research department which was responsible for maintaining current information on the characteristics, performance and investment philosophies of investment managers. The Court infers that this was not limited to "large cap growth" managers. The research department rated the investment styles or strategies[4] of the various investment managers using the following rating codes:

*Confidence Level*

| | |
|---|---|
| A | High probability of outperformance |
| A – | Probability of outperformance—lower confidence |
| B + | May outperform—higher conviction |
| B | May outperform |
| B – | May outperform—lower conviction |
| C | Low probability of outperformance |
| N | Not rated |
| O | Not rated—organizational concerns |
| P | Not rated—performance concerns |
| X | Not rated organizational and performance concerns |

No one from the research department testified about the meaning of the ratings. One ambiguity is the standard against which the ratings were measured, *i.e.,* "outperform" as measured against what? It is not clear whether all of the managers in the Universe had benchmark indexes assigned to them.

Between March of 1999 and the time of its termination in 2002 Harris Bretall's rating was a "B". The record contains no express evidence as to why "B" was chosen. The Court infers that "may outperform" was felt to best describe Harris Bretall's investment strategy because it did not reliably "outperform" on a consistent basis.

Mercer did not communicate the fact that it had a rating system, or the specific rating of any manager, to its clients. The

---

4. The Court credits Haley's testimony that the ratings referred to Mercer's degree of confidence in a manager's investment strategies.

[Trial Trans. Vol. VI at 885–86 (Testimony of Michael Haley)].

Pension Fund Trustees were never told that Harris Bretall had a "B" rating or that other managers had "A" ratings. [Trial Trans. Vol. II at 184 (Testimony of Sidney Hotard) ]. Dickson did not recall getting this information; Haley testified he did receive it. [Trial Trans. Vol. II at 257 (Testimony of John Dickson); Vol. IV at 563 (Testimony of Michael Haley) ]. Obviously, Haley would have received it after he became Mercer's field consultant to the Pension Fund in May 2001. On several occasions during May 2001—August 2002 Haley was notified that Harris Bretall's rating was "B." *See* [Trial Trans. Vol. IV at 563 (Testimony of Michael Haley) ]. He testified that in his mind "A" was similar to a "buy" signal for stock; "B" was similar to a "hold" signal. [Trial Trans. Vol. VI at 886–87 (Testimony of Michael Haley) ].

Mercer also had an internal system for communicating to personnel in its research department whether and when new research needed to be done on various investment managers, as follows:

*Research Priorities*

1 Highest priority—research update due urgently

2 Research update due within 3 months or by next IRRC meeting if earlier

3 Next research update due one year after last research update

4 To be researched if time permits

5 Not of interest
[Doc. # 191–4 at ¶ 30].

Mercer's research department did not necessarily communicate the research priority indicators to its field consultants such as Haley. [Trial Trans. Vol. IV at 645 (Testimony of Michael Haley) ]. This information was also not provided to clients. *Id.*

Harris Bretall's research priority indicator was a 3 from September 1999 until it was changed to a 5 in March 2002. [Pls.' Exh. 33].[5] Prior to March 2002 Harris Bretall's research department had recommended decreasing Harris Bretall's research priority. A notation apparently made at a August 27, 2001 research department meeting stated "decrease priority, poor performance." *Id.* at 2. Plaintiffs point out correctly that Mercer did not tell the Pension Fund that Harris Bretall's research priority indicator was decreased in March 2002.

The record contains memoranda on Harris Bretall prepared by Mercer's research department in 1995, 1999, 2000, and 2002. [Pls.' Exh. 20; Defs.' Exhs. 118, 119; Pls.' Exh 22]. These research memoranda were routinely provided to the field consultants such as Dickson and Haley, but they were not provided to clients.

*Management of the Large–Cap Growth Fund by Harris Bretall*

Harris Bretall was an aggressive large cap growth manager during 1992–2002. It tended to have "high volatility", meaning that at times it would have high returns

**5.** Between August 1997 and March 1999 Harris Bretall had a "P" rating, meaning "not rated—performance concerns". Its research priority indicator was "5", meaning "not of interest". Between March 1999 and August 1999, Harris Bretall had an "N" rating, meaning "not rated". Its research priority indicator was "5". In August 1999, Harris Bretall's rating was changed to "B" and its research priority indicator to "3". On March 14, 2002, Mercer's research group set Harris Bretall's rating at "B" and its research priority at "5". This was confirmed on August 29, 2002. This data is contained in Plaintiffs' Exhibit 33. No witness from Mercer's research group testified about what thinking went into the changes in the research priority indicators.

and at other times it would have large losses. One reason for this was that Harris Bretall placed large "sector bets"; in particular, it invested heavily in technology stocks. During the relevant time frame it was not unusual for the portfolio of a large pension plan to include a large cap growth manager with volatility, and it was not uncommon for large cap growth managers to have performance volatility.[6] The Trustees were aware of the fact that Harris Bretall was such a manager, both from the quarterly performance reports and from the presentations made by Mercer's representatives at the various Trustees' meetings. The reports and presentations are discussed below. The Court credits Dickson's and Haley's testimony that Harris Bretall tended to outperform the market when growth stocks were in favor (in an expanding economy), and to underperform the market when value stocks were in favor (for example, in a recessionary environment). [Trial Trans. Vol. V at 765 (Testimony of John Dickson); Vol. VI at 921–22, 926, 942, 951 (Testimony of Michael Haley)].

Nonetheless, the Court finds that Harris Bretall's returns were much more volatile than those of the average large cap growth manager. This was recognized in an August 15, 1995 research memo from Marianne Feeley in Mercer's research department, as follows:

> One must be aware that HBSS is a growth manager with a capital G. Standard deviation and beta of the portfolio are quite high. In fact, although they have beaten the S & P growth index over both short and long time periods, cumulative returns mask substantial quarterly volatility. Of the latest 20 quarters, HBSS has been in the first quartile eight times and in the fourth quartile seven times. Clearly not a middle-of-the-road manager, they would be most appropriate as a complement to an equity portfolio that is already very well diversified, and for a client who can stomach the wild ride. [Pls.' Exh. 20].

After the end of each quarter, Mercer prepared a performance report on all of the Pension Fund's investments. The reports for all quarters during 1995–2002 are in the record. Dickson, and then Haley, presented these quarterly reports to the Trustees at the monthly meeting following the end of each quarter and discussed them at the meetings. [Trial Trans. Vol. I at 42–43 (Testimony of Sidney Hotard)]. Together, the quarterly reports and the minutes of the meetings paint a picture of the rising and falling fortunes of the Large–Cap Growth fund that Harris Bretall managed.

The quarterly reports showed the performance of each investment manager retained by the Pension Fund and measured each manager's performance against the benchmarks applicable to that manager's class of investments. *See, e.g.,* [Pls.' Exh. 9]. Thus, for Harris Bretall, the reports showed its quarterly returns as well as the quarterly returns for the S & P Growth Index and for the Mercer Large–Cap Growth Universe. *See, e.g., id.* at 20. The data for the last twelve consecutive quarters showed whether Harris Bretall met the rolling three year benchmarks set out in the Pension Fund's Investment Policy Statement. *See, e.g., id.* at 22. Each quarterly report contained charts analyzing the risk-return ratio for each class of

---

6. The trial testimony and documents admitted at trial indicate that Harris Bretall had a high "beta". This is a measure of the risk associated with a given investment. [Trial Trans. Vol. VII at 1071 (Testimony of Robert Pen-

ter)]. A higher beta indicates greater volatility and risk and a lower beta indicates lesser volatility and risk. *Id.* Mercer's quarterly reports routinely reported on relative risk and return for all of the Pension Fund's managers.

investments. These charts always reflected that the risk associated with Harris Bretall's portfolio was high.

The period between January 1, 1995 and December 31, 2000 frames the background for Plaintiffs' claim. While the record does contain all of the quarterly performance reports for this time frame, plus minutes of all Trustees' meetings where these reports were discussed, the Court will point out only sufficient excerpts to give context to subsequent events.

The February 15, 1995 meeting was the second meeting which Mercer attended after it became the Pension Fund's investment consultant. [Defs.' Exh. 4]. At that meeting, Dickson observed: "Harris Bretall has 32.4% of the portfolio in technology, which had a very positive impact on their overall performance." *Id.* at 6. Jack Sullivan, a representative of Harris Bretall who also presented at the meeting, stated "since inception to the current date, February 3, 1995, Harris Bretall has outperformed the S & P 500 with returns of 25.9% compared to the S & P 500 return of 23.4%." *Id.* at 8. Further, Sullivan described Harris Bretall as "heavy into technology. In the second half of 1994 they were up 22% in technology compared to the S & P 500 of 9% ... Harris Bretall's proximity to Silicon Valley gives them an advantage in understanding technology sector more than other managers and they have a personal relationship with CEOs of some of these companies." *Id.* at 9.

Dickson reviewed Marianne Feeley's August 15, 1995 memorandum concerning Harris Bretall. He did not pass it on to the Pension Fund Trustees, but he did tell them of Harris Bretall's characteristic volatility. [Trial Trans. Vol. II at 253–54 (Testimony of John Dickson); Vol. V at 763 (Testimony of John Dickson) ].

The minutes of the Board of Trustees' meeting on August 30, 1995, [Defs.' Exh. 5], reflects the following relevant comments: "On the overall equity market he [Dickson] said there were extraordinary returns for the two quarters beginning January 1, 1995 ... He said growth style was better than value style for the quarter and for one year and most of the managers are growth oriented. The technology sector did extraordinarily well with a 21.6% return for the quarter." *Id.* at 1–2; "Harris Bretall has performed extraordinarily well since inception ranging from the 5th to the 35th percentile for various periods." *Id.* at 3; "[T]he equity managers are very growth oriented, especially Harris Bretall. ... When the market is growth oriented that's fine. However, when value stocks out perform growth stocks, be prepared for under performance." *Id.* at 3; "Harris Bretall performed well because they are highly concentrated in three highest performing sectors, namely, technology, finance and capital goods. He said if these sectors go down the portfolio will take a big hit." *Id.* at 3.

The minutes for the Trustees' meeting on January 24, 1996 noted: "He [Dickson] said Harris Bretall's return of 38.5% for the year [1995] was extraordinary." [Defs.' Exh. 7 at 12].

At a Board of Trustees' meeting on November 20, 1996, Dickson commented: "Harris Bretall, after a bad start because of the decline in technology stock early in the year recovered nicely in the September 30 quarter." [Defs.' Exh. 10 at 12]. For the calendar year 1996 Harris Bretall returned 18.9%, placing it in the 71st percentile of the Mercer Large Cap Growth Universe. For the same period the median return for the Mercer Large Cap Growth Universe was 21.5%, and the S & P Growth Index stocks returned 24%. [Defs.' Exh. 68 at 14].

In calendar year 1997 Harris Bretall returned 35.2%; the S & P Growth stocks returned 36.5%; the median return for the

Mercer Large Cap Growth Universe was 30.8%. [Defs.' Exh. 72 at 14].

The minutes of the November 20, 1998, Trustees' meeting stated: "Mr. John Dickson reviewed page one of the Mercer Investment Performance Evaluation for the periods ending September 30, 1998 which was the equity capital market environment. He said equities had their worst quarter in years. For the third quarter of 1998, the S & P 500 index lost 9.9%, ending its streak of fourteen straight quarters of positive performance." [Defs.' Exh. 20 at 1]. In that quarter Harris Bretall had returns of –12.5% and the S & P Growth stocks had returns of –7.2%. [Defs' Exh. 127].

Notwithstanding the bad third quarter, for the calendar year 1998 Harris Bretall had returns of 37.7%; the S & P Growth Index stocks returned 42.2% and the S & P 500 stocks returned 28.6%. [Defs' Exh. 76 at 17].

The minutes of the February 18, 1999 Trustees' meeting reflect Dickson's comments as follows: "Mr. Dickson said for the fourth quarter [of 1998] the S & P 500 had a return of 21.3% which is the best performance in a single quarter in ten years. He said growth managers outperformed value managers significantly for the quarter and year while Large–Cap managers outperformed Mid and Small–Cap managers for the one, three and five year periods." [Defs.' Exh. 22 at 2]. He said "Harris Bretall had an excellent quarter with a 33.5% return compared to the S & P 500 return of 21.3%." *Id.* at 3. The S & P Growth Index had returns of 24.5%. [Defs.' Exh. 127].

At the March 24, 1999 meeting of the Board of Trustees, Harris Bretall's representative Jack Sullivan commented in part "There are three areas you must invest in, technology, healthcare and financial." [Defs.' Exh. 23 at 2].

The minutes of the Board of Trustees' meeting held on June 2, 1999 include the following: "Mr. Dickson said the equity managers had a very good quarter. He said Large–Cap stocks continued to prevail over Mid and Small Cap stocks." [Defs.' Exh. 25 at 1–2]. Also, "Mr. Dickson said the funds' growth equity manager, Harris Bretall, Bretall, Sullivan and Smith, continues to perform extremely well outperforming the S & P 500 index and also outperforming 95% of the equity managers in Mercer's Equity Manager Universe for all periods shown in the report. He said Harris Bretall's exceptional returns have resulted from selecting extremely large capitalization growth oriented stock which have been the same stocks driving the market for the last few years." *Id.* at 3–4.

The minutes of the Board of Trustees' meeting on August 25, 1999 reflect: "Mr. Dickson said value managers outperformed growth managers by earning 12.4% for the quarter compared to growth managers' return of 8.5%." [Defs.' Exh. 27 at 5]. Also, "Mr. Dickson said Harris Bretall stumbled during the quarter earning 3.5% with Large–Cap growth stocks being out of favor. He said their performance from six months to five years is great with their five year annualized return of 31.2% in ninth percentile ranking in the Mercer Large–Cap Growth Equity Manager Universe." *Id.* at 7.

The Board of Trustees' meeting on September 15, 1999 was attended by Jack Sullivan. [Defs.' Exh. 28 at 1]. Sullivan stated that there were three positive trends which would continue to influence their investment decisions: globalization, technology and demographics. *Id.* at 2–3.

The minutes of the February 22, 2000 Board of Trustees' meeting contained the following: "Mr. Dickson said the equity market ended the year [1999] strong with all major stock indices closing the year at

record highs. He said the S & P 500 was up 21.1% for the year which is the fifth consecutive year that the S & P 500 earned greater than a 20% return. Mr. Dickson said the differential between growth and value managers for the quarter was greater than it has ever been with growth managers earning 26.3% percent for the quarter and value managers earning 5.4% for the same period. He stated that the market was still very narrow with only seven stocks making up over half of the S & P 500 return for the year. Mr. Dickson said the Nasdaq Index, which includes most technology stocks, was up 86% for the year." [Defs.' Exh. 29 at 8–9]. Also, "Mr. Dickson said that all of the Large–Cap domestic equity managers performed well during the year with Harris Bretall leading the way with a return of 38.6% and a ranking in the top quartile of Mercer's Equity Manager Universe." *Id.* at 10. Further, "He [Dickson] said that Harris Bretall's annualized return of 32.6% for the five year period was excellent and ranked them in the top ten percent of Mercer's Equity Manager Universe." *Id.* at 10.

The Trustees' meeting on March 15, 2000 was attended by Jack Sullivan as representative of Harris Bretall. Among other things, Sullivan said "[h]e believed most investors are underweighted in technology stocks but in the next twelve to eighteen months, perhaps they will be properly weighted." [Defs.' Exh. 30 at 6–7].

■ The Nasdaq peaked at 5048.62, its historic high, in March 2000. *See* Standard & Poor's, *Daily Stock Price Record, Nasdaq: The Nasdaq Stock Market, Inc.,* January–March 2000, 11 (2000).[7] The Nasdaq plummeted during the rest of 2000, ending at 2470.52 on December 29, 2000. Standard & Poor's, *Daily Stock Price Record, Nasdaq: The Nasdaq Stock Market, Inc.,* January–March 2000, 11 (2000); Standard & Poor's, *Daily Stock Price Record, Nasdaq: The Nasdaq Stock Market, Inc.,* October–December 2000, 11 (2001). This represented a loss of approximately 50% of the Index's value. By the end of 2002, the Nasdaq had fallen to 1335.51 on December 31, 2002. Standard & Poor's, *Daily Stock Price Record, Nasdaq: The Nasdaq Stock Market, Inc.,* Vol. 2 October–December 2002, 11 (2003). This represented a loss of 73% of the Index's value.

Apparently, the Trustees met on May 16, 2000, *see* [Defs.' Exh. 31 at 1], but the minutes of that meeting are not in the record. This probably was the meeting when Mercer presented the report for the first quarter of 2000. This report, Defs. Exh. 81, showed that Harris Bretall had returns of 4.5% for the quarter compared

---

**7.** This Court may take judicial notice of facts that are not subject to reasonable dispute in that they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201. The kinds of facts about which "courts ordinarily take judicial notice are (1) scientific facts: for instance, when the sun rises or sets; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958." *Shahar v. Bowers,* 120 F.3d 211, 214 (11th Cir. 1997). The returns for the NASDAQ composite index are published daily, and the histori-cal returns can be verified by resort to publications such as Standard & Poor's Daily Stock Price Record and newspapers. The Court finds that the historical returns of the NASDAQ composite index are the type of historical facts that are appropriate to take judicial notice of, and that the accuracy of the Daily Stock Price Report cannot reasonably be questioned. Accordingly, the Court takes judicial notice of, and that the accuracy of the Daily Stock Price Report cannot reasonably be questioned. Accordingly, the Court takes judicial notice of the historical NASDAQ returns published in the Daily Stock Price Report.

with 4.1% for the S & P Growth Index, and 2.3% for the S & P Growth Index, and 2.3% for the S & P 500. *Id.* at 18. Harris Bretall was in the 74th percentile of the Mercer Large Cap Growth Universe. The report noted that "growth style managers outperformed value managers for the quarter by a significant margin." *Id.* at 1.

The Trustees' September 27, 2000 meeting was attended by John Dickson as Mercer's representative. The minutes contain the following relevant excerpts: "Mr. Dickson said the equity markets were hard hit during the second quarter with the S & P 500, S & P Mid Cap, and Russell 2000 indices all posting negative results. He said value managers out performed growth managers during the quarter ... Harris Bretall also had a disappointing quarter earning (3%) compared with their benchmark S & P 500 growth index return of (1.5%)." [Defs.' Exh. 34 at 4, 7]. "... As to the three year Risk/Return Comparison for domestic equity managers, Mr. Dickson said Harris is taking the most risk but is earning more than the other managers and that ICAP is taking the least amount of risk but is earning less than the 3 other domestic equity managers." *Id.* at 8–9.

The minutes of the November 29, 2000 meeting reflect: "Mr. Dickson began his presentation of investment performance for the period(s) ending September 30, 2000 by saying it was a bad quarter for Large and Small Cap stocks ... Value managers outperformed growth managers for the second consecutive quarter earning 6.9% for the quarter compared to a 1.2% return for growth managers during the same period." [Defs.' Exh. 36 at 1]. "Harris Bretall earned 20.3% for the year and ranked in the 72nd percentile of the Mercer Large–Cap Growth Universe." *Id.* at

4. "... He said Harris' [long term] returns have been very volatile." *Id.* "... Concerning the three year risk/return comparison, Mr. Dickson said Harris is taking the most risk of all domestic equity managers but is also earning more." *Id.* Also, "Mr. Dickson said Harris Bretall had 44.6% of their portfolio in technology stocks compared to 28.2% for the S & P 500." *Id.*

The report for the period ending September 30, 200 showed that Harris Bretall had returns of –5.6 for the quarter; the S & P Growth Index had returns of –8.8 % and the S & P 500 had returns of –1.0%. [Defs.' Exh. 83 at 20].

*Report for Quarter Ending December 31, 2000*

At the March 28, 2001 meeting, Dickson presented the quarterly report for the period ending December 31, 2000. Seven of the ten Trustees [8] were present for this meeting. [Pls.' Exh. 32 at 1]. The performance report showed that Harris Bretall had returns of –20.4% for the quarter and the S & P Growth Index had returns of –16.7%. [Defs.' Exh. 84 at 20]. The S & P 500 had returns of –7.8% for the quarter. *Id.* For the three-year period, Harris Bretall had returns of 13.3%, compared to the S & P Growth Index's returns of 12.4%. *Id.* Harris Bretall ranked in the 73rd percentile in the Mercer Large–Cap Growth Managers Universe for the quarter and in the 77th percentile for the last three-year period. *Id.*

Dickson made the following comments: "He [Dickson] said value managers outperformed growth managers during the year [2000] with value managers earning 14% and growth managers losing (7.2%) during the year." [Defs.' Exh. 40 at 3]. Also, "turning to the performance of the individ-

---

8. The Trust Agreement is not in the record; however, the Court infers that the total number of Trustees was ten, with five representing labor and five representing management. *See* Former and Current Trustee list at 2, Bates Stamp NOE–ILA 022126 [Doc. # 119–31, McDonald Declaration Exh. 26].

ual domestic equity managers ... he said Harris Bretall performed the worst, losing (20.4%) for the quarter and ranking 88th out of Mercer's Equity Manager Universe. Mr. Dickson stated that Harris Bretall's return for the three, four and five year periods have been hurt by this year's performance but still rank above the median return in Mercer's Total Equity Manager Universe." *Id.* at 5. "Mr. Dickson said Harris Bretall continues to struggle losing (15.54%) for the two months [the first two months of 2001] compared with the S & P growth index return of negative (9.23%)." *Id.* at 7. "Mr. Niemand asked Mr. Dickson if the Trustees should begin to search for a replacement for Harris Bretall because their results had fallen well below their peers. Mr. Dickson said he still has confidence in Harris Bretall." *Id.*

Because Plaintiffs' claim focuses on Harris Bretall's management of the Pension Fund's Large–Cap Growth fund beginning with the first quarter of 2001 through the third quarter of 2002, Mercer's performance reports covering those quarters plus the minutes of the Trustees' meetings where these reports were discussed will be examined in some detail, together with relevant trial testimony. Haley took over as Mercer's representative to the Pension Fund in April 2001. He had worked for Mercer since 1994. [Trial Trans. Vol. VI at 864 (Testimony of Michael Haley)]. Haley met with Dickson to discuss the Pension Fund account. He reviewed Dickson's extensive file on the account and discussed it with him. He reviewed old quarterly performance reports, which included information on Harris Bretall's performance. *Id.* at 873 (Haley). He learned in his review that in 1998 the Trustees had decided to increase the allocation of equity assets from 50 percent to 60 per cent, thereby diminishing the percentage of low risk fixed income assets. *Id.* He correctly viewed this as an indicator that the Trustees had decided to take on more risk, with

the potential for greater earnings. *Id.* He reviewed memoranda produced by Mercer's research department which was available both online and in Dickson's file, which probably included the 1995, 1999 and 2000 research memos on Harris Bretall. *Id.* at 874 (Haley).

At the time he took over the Pension Fund account, Haley was an experienced investment consultant. He had been an investment consultant for thirteen years. *Id.* at 864 (Haley). He had advised approximately 50 to 60 retainer investment clients. *Id.*

From his review of Mercer's old quarterly performance reports, Haley learned that Harris Bretall was a volatile performer—often with very high positive returns or very low negative returns. He learned that Harris Bretall outperformed the market when growth stocks were in favor, and underperformed the market when value stocks were in favor. He learned that Harris Bretall had accrued mostly high returns in the 1995–1999 time frame.

Haley prepared for each of the Trustees' meetings by familiarizing himself with the quarterly performance report for the last quarter, which would be the subject of the upcoming meeting. [Trial Trans. Vol. VI at 899, 909 (Testimony of Michael Haley)]. He also sometimes did independent research in preparation for the meeting. *Id.* at 908, 917 (Haley). He had periodic conversations with Marianne Feeley in the research department but he could not recall the substance of the conversations or when they occurred. *Id.* at 926 (Haley); [Trial Trans. Vol. IV at 615 (Testimony of Michael Haley)].

*Report for Quarter Ending March 31, 2001*

At the May 2001 meeting of the Pension Fund's Board of Trustees, Haley presented the quarterly report for the first quarter of 2001. Nine of the ten Trustees were

present at this meeting. [Pls.' Exh. 18 at 1]. The report showed that, for the quarter, Harris Bretall had returns of –23.9% and the S & P Growth Index had returns of –17.4%. The S & P 500 had a return of –11.9%. [Pls.' Exh. 9 at 20]. Harris Bretall had 25.8% of its portfolio[9] in technology stocks, compared to 17.8% technology stocks in the S & P 500. *Id.* at 25. Harris Bretall had three-year returns of –1.3%, while the S & P Growth Index had three-year returns of 3.1%. *Id.* Harris Bretall was in the 81st percentile in the Mercer Large Cap Growth Universe for the quarter and in the 91st percentile for the three-year period ending March 31, 2001. *Id.* Thus, the report showed that for the first time since 1998 Harris Bretall's performance fell below both of the rolling three-year benchmarks set out in the Investment Policy Statement.

Haley commented on these results at the May 31, 2001 meeting. He informed the Trustees that Harris Bretall had not been performing well against its peers in the Mercer Large Cap Growth Universe, ranking in the 83rd percentile for the one-year returns and in the 86th percentile for the five-year period. [Pls.' Exh. 18 at 6]. The minutes of the meeting reflect that the Trustees asked no questions of Haley regarding Harris Bretall, and that Haley did not make any recommendation in regard to Harris Bretall. *See id.* at 4–8. Jack Sullivan, representing Harris Bretall, made a presentation to the Trustees after Haley's presentation. *Id.* at 8. He said that while the account lost 11.8% from January 1, 2001 to May 25, 2001, for various reasons "... the account would be up by 10% to 12% by the end of the year." *Id.* at 9–10. Harris Bretall remained the Pension Fund's Large–Cap Growth manager after this meeting.

Plaintiffs' expert witness Gerald Clarke testified that Haley should have recommended Harris Bretall's termination at the May 2001 Trustees' meeting, after Harris Bretall failed to meet the two rolling three-year benchmarks at the end of the first quarter of 2001. He also testified that Haley should have contacted Mercer's research department for more information concerning Harris Bretall, when quarterly reports were received which reflected poor results.

Clarke testified that upon examining the quarterly reports for the second, third and fourth quarters of 2000 and for the first quarter of 2001, he had concluded that a trend was evident which should have indicated to Mercer that it was time to recommend Harris Bretall's termination. In essence, he testified that Mercer should have realized that it was highly unlikely that Harris Bretall would again meet its rolling three-year benchmarks. He said, "... they commenced a sustained and continuous decline on a one year and on a three year basis relative to their benchmark and it was the benchmark that caused me to conclude they were in serious trouble ..., as was represented by the equivalent one year and three year [rankings] Mercer calculated ... I concluded that enough was enough on March 31, when they hit another nearly 25% loss in that quarter alone, because they had continuously violated the guidelines of the ratings." [Trial Trans. Vol. III at 376–77 (Testimony of Gerald Clarke)]. While Clarke's analysis was couched in statistical terminology, the gist of his opinion was simply that because Harris Bretall's cumulative rankings were very low for the one year and three year periods preceding the close of the March 2001 quarter, it was unlikely that its ability

---

9. The full portfolio is not set out in the quarterly report. Harris Bretall's top ten holdings are listed: Pfizer, General Electric, Citigroup, Walmart, Johnson & Johnson, Intel, Wells Fargo, Applied Materials, Genentech, Goldman Sachs. [Pls.' Exh. 9 at 27].

to meet these cumulative benchmarks would improve. Especially with the three year rankings which were determinative of the question whether the benchmarks were met, including the data from two particularly bad quarters, it would take a long time to significantly alter Harris Bretall's cumulative three year ranking. Clarke was correct to this extent. What Clarke's analysis missed, however, is that Mercer's recommendations to continue Harris Bretall were not limited to consideration of what had happened in the past. Any recommendation necessarily had to consider the circumstances prevailing in March 2001, with a view toward the immediate future. The question the Trustees were asking Mercer was not just whether Harris Bretall should be terminated; it also was, implicitly, "Is there something better we can do now?" [10]

Robert Penter, Defendants' expert witness testified that Haley's decision not to recommend Harris Bretall's termination in May 2001 (or alternatively as late as March 2002) was prudent. Penter has been in the investment consulting business since 1986. Until 2006 he worked for a large investment consulting firm which is a competitor of Mercer's. He testified that failure to meet performance benchmarks does not necessarily trigger the need to terminate the investment manager, but rather it triggers the need for additional scrutiny of the manager's performance. [Trial Trans. Vol. VII at 1082–84, 1104–05, 1156 (Testimony of Robert Penter)]. He testified that a volatile large cap investment manager is not an unusual choice for a pension fund. Normally the large cap fund is expected to take risk, so as to balance other parts of the portfolio which

take less risk. He said that his firm did not provide its internal ratings on investment managers to clients. [Trial Trans. Vol. VI at 1063 (Testimony of Robert Penter)]. The Court credits this testimony.

Haley explained his May 2001 recommendation to continue Harris Bretall as follows:

I advised the Fund to maintain or hold Harris Bretall because the underperformance that they had experienced recently, which was severe, was explainable and not due to what I felt was any kind of flaw in their investment process or change at the firm.

[Trial Trans. Vol. VI at 596 (Testimony of Michael Haley)].

Plaintiffs countered Haley's testimony that there had been no "change" at Harris Bretall with the content of the August 23, 2000 research memorandum from Marianne Feeley. (Defs.Exh.119). The memorandum relates what Harris Bretall's portfolio manager had said in an August 23, 2000 conference and also contains some comments by Feeley. She commented that Harris Bretall had deviated from its normally equally weighted portfolio, but stated that she does not object to that in principle. She observed that this had been done to adjust the weighting of those stocks which would otherwise result in "negative bets against the index", i.e., to weight Harris Bretall's portfolio so that it would be more in line with the weighting of the Standard & Poor Growth Index. Also, the memorandum commented that Harris Bretall had allowed position sizes of certain stocks to exceed that which would be dictated by Harris Bretall's normally equally weighted portfolio. She observed

---

10. Clarke was not a persuasive witness. He has training and employment experience in the fields of statistical analysis and information technology systems. His exposure to pension plans and investment consulting has

been as a member of a firm which provides litigation consultation and expert witness services. This is a questionable basis for status as an expert witness.

that this also had been done to avoid a negative bet against the benchmark. The Court finds that the August 23, 2000 memo did not reflect a change in Harris Bretall's investment strategy.

Referring to May 2001, Haley further testified as follows:

> What this—knowing what was going on at this time period, what we saw was that aggressive growth managers like Harris Bretall were beginning to significantly underperform because growth-equity stocks were going out of favor. Types of growth managers who were tending to do—starting to do well at this time period and significantly better were growth-equity managers who were more conservative, some of who were—had some value components to their process, what we call "growth at a reasonable price."
>
> Harris Bretall was more of a momentum growth manager. They tended to do better when growth stocks were in favor; they tended to do worse when growth-style investing was out of favor, so that's an explanation as to why they looked like they do on these charts.

[Trial Trans. Vol. VI at 599 (Testimony of Michael Haley)].

Haley also testified that historically Harris Bretall tended to outperform the market when markets were rising. When markets were falling, they tended to underperform the market. *See* [Trial Trans. Vol. VI at 604 (Testimony of Michael Haley)]. The Court credits this testimony.

*Report for Quarter Ending June 30, 2001*

The report for the quarter ending June 30, 2001 was presented to the Trustees at their monthly meeting held on August 22, 2001. Nine of the ten Trustees were present at this meeting. [Pls.' Exh. 19 at 1]. The report stated that "[a]fter four quarters of increasingly negative returns, growth managers rebounded in the second quarter, outperforming value managers."

[Pls.' Exh. 10 at 1]. Harris Bretall's performance in the quarter was improved; it had returns of 8.2% and beat the S & P Growth Index by 0.5%. [*Id.* at 16]. The S & P 500 had a quarterly return of 5.9%. *Id.* at 1. Harris Bretall's return for the three-year period was 0.5%, while the S & P Growth Index stocks had returns of 0.9% for the same period. *Id.* Harris Bretall ranked in the 30th percentile in the Mercer Large Cap Growth Universe for the quarter but in the 85th percentile for the three-year period. *Id.* Thus, Harris Bretall failed to meet both of its rolling three-year benchmarks for the second quarter in a row despite its good performance during the quarter. In his presentation of these results, Haley discussed Harris Bretall's results over the past eight years, noting that Harris Bretall had had three bad years, four good years, and one mediocre year. [Pls.' Exh. 19 at 7].

The Pension Fund's co-counsel, William Lurye ("Lurye"), expressed concern about Harris Bretall's poor long-term results. *Id.* The Fund's other co-counsel, David Walker, shared Lurye's concern. *Id.* Haley stated that he did not think it was time to terminate Harris Bretall. *Id.* According to the meeting minutes and Haley's testimony at trial, Haley believed that nothing significant had changed at Harris Bretall in the past year; there were no personnel changes and Haley thought "Harris Bretall had not gotten stupid over the last year." *Id.*; [Trial Trans. Vol. VI at 930–31 (Testimony of Michael Haley)]. Haley believed that Harris Bretall's results had gone down so quickly that it could rebound just as quickly. [Pls.' Exh. 19 at 7]. At the meeting, one of the Trustees noted that the investment consultant was recommending retention but the Plan's attorney was recommending termination. *Id.* Lurye clarified that he was not recommending termination but reminding the Trustees that, as fiduciaries, they needed to monitor

the investment managers' long term results. *Id.* After some discussion, the Trustees decided to retain Harris Bretall but to place it on the watch list. *Id.*

*Report for Quarter Ending September 30, 2001*

The report for the third quarter of 2001 was presented to the Trustees at their November 2001 meeting. Seven of the ten Trustees were present for the meeting. [Pls.' Exh. 21 at 1]. The report stated, "value managers outperformed growth managers by a wide margin for the quarter and 12 months period." [Pls.' Exh. 11 at 1]. It stated that Harris Bretall had returns of –23.7% for the quarter, while the S & P Growth Index stocks had returns of –13.2%. *Id.* The S & P 500 stocks had a return of –14.7. *Id.* at 1. Harris Bretall's three-year returns were –4.0% and the S & P Growth Index's returns for the same period were –1.3%. *Id.* Harris Bretall ranked in the 92nd percentile of the Mercer Universe for the quarter and in the 94th percentile for the three-year period. *Id.* Thus, Harris Bretall failed to meet both of its rolling three-year benchmarks for the third quarter in a row.

Haley noted Harris Bretall's continued poor performance in his presentation to the Trustees. [Pls.' Exh. 21 at 8]. However, Haley also presented the Trustees with Harris Bretall's returns for all periods ending June 30, 2000 and noted that Harris Bretall had been in the top quartile for all of those periods except one. *Id.* Haley stated to the Trustees that he felt there was no need to take any action regarding Harris Bretall at that time. *Id.* The minutes reflect that the Trustees did not ask any questions of Haley regarding Harris Bretall. *See id.* at 6–9.

The minutes reflect that Sullivan, Harris Bretall's representative, also gave a presentation to the Trustees at the meeting. *Id.* at 9. In part, Sullivan reported: "as of November 23, 2001, the account is down 26.3% since January 1, 2001 but that he believed the return would be positive by December 31, 2001. He said if Osama Bin Laden is taken out, it would be a significant psychological boost to the market. Mr. Sullivan said the portfolio is basically allocated as follows: 20% Consumer Cyclicals, 20% Healthcare, 20% Finance, and about 25 to 30% in Technology oriented stocks.... Mr. Sullivan stated that he believed the recession would end by the first quarter 2002. He said valuations favor equities over bonds because bonds are so expensive as a result of the low interest rates." *Id.* at 9–10. Harris Bretall remained the Fund's Large–Cap Growth manager after this meeting.

*Report for Quarter Ending December 31, 2001*

The report for the fourth quarter of 2001 was presented to the Trustees at the February 2002 meeting. Eight of the ten Trustees were present at this meeting. [Pls.' Exh. 24 at 1]. The report noted that "[l]arge-Cap growth stocks outperformed large value stocks for the quarter." [Pls.' Exh. 12 at 1]. The report also showed that Harris Bretall had good performance in the quarter with returns of 16.9%, *id.* at 16, compared to the S & P Growth Index stocks which had returns of 13.0%. *Id.* The S & P 500 had returns of 10.7%. *Id.* Harris Bretall ranked 23rd in the Mercer Large Cap Growth Universe for the quarter. *Id.*

Nonetheless, Harris Bretall's rolling three-year returns were –8.1%, compared to the S & P Growth Index's returns of –4.5% for the same period. *Id.* Also, Harris Bretall ranked in the 96th percentile of the Mercer Universe for the three-year period. *Id.* Thus, Harris Bretall again failed to meet both of its rolling three-year benchmarks despite its good performance in the quarter.

Technology stocks represented 18.3% of the S & P 500 by weight. *Id.* at 1. Harris

Bretall had 29.6% of its portfolio in technology stocks. *Id.* at 23.

Haley discussed Harris Bretall's performance with the Trustees. [Pls.' Exh. 24 at 8–9]. He presented the Trustees with a report showing Harris Bretall's returns for each year since 1994. *Id.* Haley stated that Harris Bretall's overall poor performance in the past two years had brought down the relatively strong performance of the prior years. *Id.* Haley recommended being patient with Harris Bretall, to see if it could turn around the disappointing results. *Id.* at 9. Lurye questioned this recommendation, given Harris Bretall's poor long-term results. *Id.* Haley responded that Harris Bretall's performance had decreased so quickly that he believed termination was premature. *Id.* Haley stated that if Harris Bretall did not improve its performance, the Trustees should consider replacing the firm. *Id.* After some discussion, the Trustees voted to initiate a search for an investment manager to replace Harris Bretall, in case the Trustees decided to replace it. *Id.* Haley stated that Mercer's fee for the search would be between $20,000 and $25,000.[11] *Id.*

*March 2002 Meeting*

At the next monthly Trustees' meeting, on March 27, 2002, the Trustees discussed the situation regarding Harris Bretall. No quarterly report was presented at that time; consequently, a representative from Mercer was not present. *See* [Pls.' Exh. 23 at 1]. The Trustees decided to delay the search for a potential replacement for Harris Bretall until the returns for the current quarter had been received. *Id.* at 8.

*Report for Quarter Ending March 31, 2002*

The report for the first quarter of 2002 was presented to the Trustees at their May 17, 2002 meeting. All ten of the Trustees were present for the meeting. [Pls.' Exh. 25 at 1].

As the performance report showed, Harris Bretall had returns of –0.4% for the quarter and the S & P Growth Index had returns of –0.8%. [Pls.' Exh. 14 at 18]. The S & P 500 had returns of 0.3%. *Id.* Harris Bretall was in the 28th percentile of the Mercer Large Cap Growth Universe for the quarter. *Id.* Yet, Harris Bretall had rolling three-year returns of –11.7%, while the S & P Growth Index had rolling returns of –6.8% for the same period. *Id.* Harris Bretall's ranking for the three-year period was 94th in the Mercer Large Cap Growth Universe. *Id.* Thus, Harris Bretall failed to meet its three-year benchmarks even though it had done relatively well in the first quarter of 2002.

During the first quarter of 2002, technology stocks represented 17.3% of the S & P 500. Harris Bretall had 32.3% of its portfolio invested in technology stocks.

Haley discussed these results with the Trustees at the May 2002 meeting. He informed the Trustees that Harris Bretall had not done well in April and was therefore off to a poor start for the second quarter. [Pls.' Exh. 25 at 7–8]. One of the Trustees asked Haley if he was recommending a change or thought Harris Bretall should be given more time. *Id.* at 8. Haley responded that he recommended being patient with Harris Bretall because he believed the firm would reward the Trustees long-term. *Id.* Another Trustee asked when Harris Bretall had performed well, to which Haley responded that Harris Bretall had done well for the years ending March 31, 1995, 1997, 1998, and 1999. *Id.*

11. Mercer periodically received a percentage of the Pension Fund's assets as its general consulting fee. Other services, including a search for a new investment manager, were extra. [Trial Trans. Vol. VI at 896–97 (Testimony of Michael Haley) ].

Jack Sullivan and David Post, representatives of Harris Bretall, were then admitted to the meeting and made a presentation to the Trustees, in part as follows: "Mr. Sullivan informed the Trustees of his upcoming retirement and said he would still be involved with the firm in a management capacity. He then introduced David Post as Director of Research for the company. Mr. Sullivan apologized for his optimism the last time he was there [May 2001], but he said he believed good times were ahead ... Mr. Post informed the Trustees how Harris Bretall repositioned the portfolio during the last 18 months by showing that the stocks which were sold during this period lost (20.0%) while the Russell 1000 Growth lost (13.3%) during the same period and the stocks which were bought during the last 18 months lost (5.4%) compared to the Russell 1000 Growth Index negative return of (8.9%). Mr. Haley pointed out that Harris Bretall still underperformed the Index during the last 18 months. Mr. Post said Harris Bretall should have turned their portfolio over even more because those stocks which were held hurt their performance more than what was bought and sold during that period ... Mr. Post said the earnings reports for April 2002 were better than the previous four months' reports. He said Harris Bretall was overweighted in Technology and Financial Services and underweighted in Healthcare stocks." [Pls.' Exh. 25 at 10–11].

With respect to Haley's recommendation at the May 2002 meeting that Harris Bretall should be retained, he gave the following reasons. First, he pointed to the fact that in three of the four preceding quarters, Harris Bretall's returns had exceeded the returns of the S & P Growth Index. (TR at 964). The only quarter in which they had not done so was the third quarter of 2001, in which the terrorist attacks of 9/11 had occurred. Secondly, he reiterat-

ed that nothing at Harris Bretall had changed. Specifically:

Again, we had not seen a change in the firm, the organizational structure, the investment philosophy, the process, the characteristics. They were still buying growth stocks.

[Trial Trans. Vol. VI at 968 (Testimony of Michael Haley)].

*Report for Quarter Ending June 30, 2002*

The report for the second quarter of 2002 was presented to the Trustees at their August 2002 meeting. All ten Trustees were present for this meeting. [Pls.' Exh. 26 at 1]. The performance report revealed that Harris Bretall had poor performance in the quarter with returns of – 20.53% [Pls.' Exh. 15 at 26], compared with the S & P Growth Index returns of – 16.26%. *Id.* The S & P 500 had returns of – 13.4%. *Id.* at 5. Harris Bretall had returns of –19.17% for the three-year period, while the S & P Growth Index had returns of – 13.25%. *Id.* at 26. Harris Bretall ranked in the 92nd percentile in the Mercer Universe for the quarter and in the 96th percentile for the three-year period ending June 30, 2002. *Id.*

The report reflected that "information technology" stocks represented 13.9 % of the S & P 500; *Id.* at 2, 23.6 % of Harris Bretall's portfolio was in technology stocks, *Id.* at 55. The report for the second quarter of 2002 also made the following comment about Harris Bretall: "[p]oor stock selection in the technology and consumer discretionary sectors hindered performance." *Id.* at 8.

When Haley presented these results to the Trustees, he stated that Harris Bretall's stock selection had "gone negative" and that they had underperformed their peers for all periods shown in the report, including the last five-year period. [Pls.' Exh. 26 at 6–7]. As a result, Haley recom-

mended terminating Harris Bretall. *Id.* at 7. After some discussion, the Trustees decided to terminate Harris Bretall and authorized Mercer to begin looking for a replacement immediately. *Id.* At some point in the fourth quarter of 2002, the Fund's assets were moved from Harris Bretall to the new large-cap growth manager. Ultimately Haley decided Harris Bretall should be terminated because:

> their stock selection "had gone negative in this last quarter, and that was something that to me was a difference". It was a change for Harris Bretall, Bretall, and if I remember correctly, the negative stock selection had occurred primarily in technology stocks, which was still an area for them that was important, had been for quite some time, and Harris Bretall, Bretall had, of course—number one, they are a stock-picker, a bottom up stock-picker, and for an investment manager who professes to be able to add value by picking stocks, if your stock selection goes negative, that's not good, and I was certainly looking for reasons not to hold them any longer. I was looking for a reason—something that was different that I could point to the Trustees and say, you know, "This is something I haven't seen before."

[Trial Trans. Vol. IV at 664 (Testimony of Michael Haley)].

Several of the Pension Fund Trustees testified that if they had known that Mercer had 20 to 30 "A"-rated large cap growth managers, and that Harris Bretall had a "B" rating, or if they had been told that Harris Bretall's research priority had been downgraded from a 3 to a 5 in March 2002, they would have insisted that Harris Bretall be terminated and replaced with one of the "A"-rated managers. [Trial Trans. Vol I at 82–87 (Testimony of Sid-

ney Hotard); Vol. II at 184–85 (Testimony of Mark Ellis), 220–21 (Testimony of Dwayne Boudreaux)]. The Court does not credit this testimony because it appears that these Trustees did not understand Mercer's rating system or the meaning of its research priority indicators. Their understanding was that Harris Bretall was not among the "best" managers Mercer had to offer; therefore, they wanted one of the "best" performers.

## II.   *Conclusions of Law*

### A.   *Breach of Fiduciary Duty*

■ A claim of breach of fiduciary duty may be based on failure of the fiduciary's obligation of exclusive loyalty to its client or on the fiduciary's failure to exercise the appropriate degree of care in carrying out its responsibilities to the client. *See Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 143 n. 10, 105 S.Ct. 3085, 3090 n. 10, 87 L.Ed.2d 96 (1985). This case involves only the latter type of claim.[12] Plaintiffs have not claimed that Defendants breached the duty of exclusive loyalty to the Pension Fund.

The degree of care required of an ERISA fiduciary is statutorily prescribed, in relevant part as follows:

> (A) Prudent man standard of care.
>
> > (1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> \* \* \* \*
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an

---

**12.** For the purposes of this action only, Defendants have stipulated that they are fiduciaries subject to ERISA for the work performed

under the October 1994 agreement with the Pension Fund. [Doc. # 191–4 at ¶ 16].

enterprise of a like character and with like aims.

29 U.S.C. § 1104(a). The Department of Labor has promulgated a regulation clarifying the investment duties of a fiduciary under ERISA's standard of care. *See* 29 C.F.R. § 2550.404a–1. That regulation states in relevant part:

> (b) Investment duties.
>
> > (1) With regard to an ... investment course of action taken by a fiduciary of an employee benefit plan pursuant to his investment duties, the requirements of section [1104](a)(1)(B) of the Act set forth in subsection (a) of this section are satisfied if the fiduciary:
> >
> > > (I) Has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular ... investment course of action involved, including the role the ... investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and
> > >
> > > (ii) Has acted accordingly.
> >
> > (2) For purposes of paragraph (b)(1) of this section, "appropriate consideration" shall include, but is not necessarily limited to,
> >
> > > (I) A determination by the fiduciary that the particular ... investment course of action is reasonably designed, as part of the portfolio ... to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain ... associated with the ... investment course of action, and
> > >
> > > (ii) Consideration of the following factors as they relate to such portion of the portfolio:

> > > > (A) The composition of the portfolio with regard to diversification;
> > > >
> > > > (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and
> > > >
> > > > (C) The projected return of the portfolio relative to the funding objectives of the plan.

29 C.F.R. § 2550.404a–1(b).

■ When evaluating an alleged breach of fiduciary duty under ERISA, courts use an objective standard, focusing on whether the fiduciary employed appropriate methods to reach an investment decision. *Meinhardt v. Unisys Corp.* (*In re Unisys Saving Plan Litig.*), 74 F.3d 420, 434 (3rd Cir.1996). The results of the fiduciary's investment decision are not the focus of the inquiry. *Id.* Rather, the fiduciary's conduct is to be evaluated "under the circumstances then prevailing," and therefore without the benefit of hindsight. *·Chao v. Merino*, 452 F.3d 174, 182 (2nd Cir.2006). Applying these principles in this case, the Court must determine whether Mercer failed to consider appropriate factors in determining whether to recommend Harris Bretall's termination in May 2001 and subsequently.

■ Plaintiffs have the burden of persuasion, and must prove their case by a preponderance of the evidence. *See Sullivan v. LTV Aero. & Defense Co.*, 82 F.3d 1251, 1260 (2nd Cir.1996) (applying the preponderance of the evidence standard, customary in civil litigation, in an ERISA case). Neither party has suggested that a different standard is applicable here. *See* [Docs. # 223, # 224]. Therefore, it is Plaintiff's burden to persuade the Court by a preponderance of the evidence that Mercer failed to consider the appropriate factors before recommending that the Pen-

sion Fund defer consideration of Harris Bretall's termination.

█ Plaintiffs' first claim is that Defendants' failure to recommend Harris Bretall's termination, when the rolling three year benchmarks were not met in the first quarter of 2001 and alternatively when they were not met as late as the first quarter of 2002, violated ERISA's reasonable diligence standard. Plaintiffs are correct that the applicable standard must take into account Mercer's position in a community of investment consultants to large institutional investors such as pension funds. Defendants are correct that Plaintiffs offered no expert testimony defining the applicable standard of care and that it had been breached. Regardless, the Court finds that Harris Bretall's failure to meet the rolling three year benchmarks did not itself mean that Harris Bretall was negligent in selecting investments; by extension, Mercer's failure to recommend Harris Bretall's termination when it failed to meet the rolling three year benchmarks did not mean that Mercer was automatically negligent. The benchmarks did not define the standard of care; they defined the Pension Fund's designated threshold of success for its investment managers. They served an informational function for the benefit of the Pension Fund, Mercer, and the investment managers such as Harris Bretall. Therefore, Mercer certainly had an obligation to keep the Pension Fund informed of whether Harris Bretall was meeting the benchmarks. It is abundantly clear that Mercer did so on a quarterly basis, both with substantial, detailed, quarterly performance reports, and by oral reports at the Trustees' meetings following the close of each quarter. Plaintiffs make no claim that Defendants failed to provide timely, accurate reports of Harris Bretall's performance as measured by the benchmarks.

Plaintiffs' first claim is also stated more broadly, as follows. Not only did Harris Bretall fail to meet the rolling three-year benchmarks; the Large Cap Growth fund also sustained large capital losses, beginning in the last three quarters of 2000 and the first quarter of 2001. Particularly given that Mercer knew of other more qualified large cap investment managers who could replace Harris Bretall (as evidenced by the fact that some managers in the Mercer Large Cap Growth Universe had "A" ratings as opposed to Harris Bretall's "B" rating), Mercer was negligent in failing to recommend that Harris Bretall be replaced in May 2001.

Plaintiffs also contend that Defendants failed to provide certain relevant information to them in May 2001 and May 2002 which would have caused them to reject Defendants' recommendations that Harris Bretall be retained. Plaintiffs further contend that Haley failed to obtain relevant information from Mercer's research department which might have shown that Harris Bretall's investment processes had changed, or that Harris Bretall's stock selection had "gone negative" prior to the second quarter of 2002.

Defendants' response is that it was not imprudent to adopt a wait-and-see approach in May 2001 and thereafter because of Harris Bretall's generally strong performance during 1995–1999, its history of offsetting large losses with subsequent large gains, plus the fact that Harris Bretall's investment philosophy and investment processes (the way Harris Bretall went about picking stocks) had not changed. They deny that they failed to provide relevant information to the Pension Fund and deny that Haley failed to obtain relevant information from Mercer's research department.

█ The Court turns to Plaintiffs' claim that Defendants failed to provide relevant

information to the Trustees at the time of recommending Harris Bretall's retention in May 2001 and subsequently. Plaintiffs argue that if they had had this information they would have terminated Harris Bretall, thereby averting the losses which later occurred. Several Trustees so testified. [Trial Trans. Vol. I at 87–88 (Testimony of Sidney Hotard); Vol. II at 187 (Testimony of Mark Ellis), 220–21 (Testimony of Dwayne Boudreaux)].

The specific items of information Plaintiffs have identified as not provided are the following: (1) the fact that Mercer had 20 to 30 large cap growth managers in the Mercer Large Cap Growth Universe in whom it had greater confidence than Harris Bretall; (2) the fact that Mercer had an internal ratings system for large cap growth investment managers in which 15% of the managers had an "A" rating, as opposed to Harris Bretall's "B" rating; (3) the fact that Harris Bretall was rated "not rated—poor performance" in Mercer's internal rating system as recently as February 1999; (4) the fact that Mercer's research department downgraded Harris Bretall's research priority indicator from 3 to 5 in March 2002; (5) the existence of Marianne Feeley's 1995 research memo on Harris Bretall which Plaintiffs claim would have caused them to terminate Harris Bretall in May 2001, had they been supplied the facts in the memo. Plaintiffs are correct that items (1) through (5) were not furnished *per se* to the Trustees.

Regarding Items (1) and (2), the Court first finds that there is not reliable evidence in the record showing that Mercer literally[13] had 20 to 30 large cap growth managers in its Large Cap Growth Universe who had "A" ratings. The "20 to 30" range was derived in the following manner. Plaintiffs' expert witness Gerald Clarke testified that there were approximately 200 managers in Mercer's Large Cap Growth Universe. [Trial Trans. Vol. III at 324 (Testimony of Gerald Clarke)]. Defendants did not dispute that testimony. Haley testified that approximately 10 to 15 percent of Mercer's investment managers were "A" rated. When Defendants' expert witness Robert Penter testified, Plaintiffs' counsel asked the following question: "Q . . . given that spectrum, we understand that 10 to 15 percent of all of the managers in the Large Cap Growth Mercer Universe received an 'A' rating, 10 to 15 percent? Did you hear the same testimony I did?" Penter responded: "I heard that, that's correct." [Trial Trans. Vol. VII at 1118 (Testimony of Robert Penter)]. However, in reality Haley's testimony was directed not to the Mercer Large Cap Growth Universe, but to all of the investment managers who were rated by Mercer's research department. Therefore, even though Penter agreed with the thrust of Plaintiffs' counsel's question, he mis-remembered Haley's testimony.

More importantly, Mercer's rating system did not pertain to its overall level of confidence in an investment manager's competency. It pertained to its level of confidence that, given the manager's investment strategy, it would "outperform" an unstated standard. This standard could have been the market, *i.e.*, the S & P 500 or it could have been the benchmark index assigned to that particular manager's portfolio. The evidence does not clarify this point. Either way, a manager could achieve an "A" rating with a conservative strategy which would regularly exceed the standard by a very small amount.

Regarding Item (3), the Court finds that Harris Bretall's rating in Mercer's internal rating system in February 1999 ("not rated—poor performance") was not relevant

13. The Court does believe that Mercer had a pool of large cap growth managers who had an "A" rating. This pool could have been larger or smaller than "20 to 30".

to the Trustees' decision whether to retain Harris Bretall in May 2001 or thereafter. For the third quarter of 1998 Harris Bretall had returned –12.5%, much less than the S & P Growth Index's –7.2%. In the fourth quarter of 1998 (the last quarter before the February 1999 rating came out) Harris Bretall had returned 33.5%, much more than the S & P Growth Index's return of 24.5%. The Court believes it was Harris Bretall's magnified zigzag pattern, not lesser competency or lesser earnings, which influenced the research department's ratings. Also, the February 1999 rating was not relevant to decisionmaking in 2001. The failure to provide the February 1999 rating to the Trustees was not imprudent.

Regarding Item (4), Mercer's research department downgraded Harris Bretall's research priority indicator from 3 to 5 in March 2002. The Court credits Haley's testimony that the research priority indicator was not intended to indicate the quality of the investment manager; instead, its purpose was to signal whether and how urgently new research needed to be done. Mercer's and Haley's failure to tell the Trustees about the research department's March 2002 decision was not a breach of fiduciary duty because it was irrelevant to the decision whether to retain Harris Bretall.

Regarding Item (5) (the August 15, 1995 memorandum [Pls. Exh. 20] in which Marianne Feeley observed that Harris Bretall was a growth manager with a capital "G", and that it would be a suitable investment manager only for a client whose assets were otherwise very well diversified and who could "stomach the wild ride"), the Court finds that the information in the memorandum was relevant in nature to the Trustees' decision whether to keep Harris Bretall. However, what was important was not that the Trustees get a copy of the memorandum; rather, it was important that they be supplied information concerning Harris Bretall's volatility. The record reflects that as early as August 1995, Dickson expressly informed the Trustees of this fact, and warned them that while Harris Bretall's performance would be excellent while growth stocks were in favor (i.e., in an expanding economy), they should expect under performance when value stocks were in favor (this would include a period of recession). Information regarding Harris Bretall's volatility was repeated many times both in the quarterly reports and in comments at the Trustees' meetings. One of the Trustees, Win Niemand, testified in his deposition that the Trustees realized Harris Bretall was a high-risk manager. [Trial Trans. Vol. VI at 1024–25 (Deposition read-in of Win Niemand)]. Tom Daniel, the Pension Fund's administrator, testified that Harris Bretall was one of the Fund's riskier investments in the period 1999–2002. *Id.* at 858–59 (Testimony of Tom Daniel). Because the Trustees had the essence of the information contained in the 1995 Feeley memorandum, the failure to supply the memorandum did not constitute a breach of fiduciary duty on Mercer's part.

■ The Court next turns to Plaintiffs' claim that Haley negligently failed to obtain information from Mercer's research department which he needed to competently advise the Trustees whether to replace Harris Bretall. The only item specified by Plaintiffs is an August 23, 2000 research memorandum authored by Marianne Feeley. Haley could not recall whether he had seen the memorandum. Plaintiffs argue that it showed that Harris Bretall's "investment processes" had changed, such that Mercer should have recommended its termination. However, as previously determined, Plaintiffs misinterpret the memorandum. Harris Bretall had not changed its procedure for picking

or retaining stocks. Aside from the memorandum, Plaintiffs' argument is based on an assumption that the research department had information Haley did not know about which would have changed his opinion concerning Harris Bretall; for example, information that Harris Bretall's stock selection had "gone negative" prior to the second quarter of 2002. But Plaintiffs have failed to show that any such information existed; they have the burden of proof so this claim fails.

■ Finally, the Court returns to the broader version of Plaintiffs' first claim. This is the argument that a confluence of factors made Haley's failure to recommend termination of Harris Bretall in May 2001 and subsequently imprudent. Looking to ERISA's definition of prudence ("the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims") the Court notes that Plaintiffs did not present the testimony of a person familiar with pension fund (or other similar client) investment standards to testify that Mercer's and Haley's actions violated the relevant standard of care. The Court does not rule that the absence of this testimony is automatically fatal to Plaintiffs' case, as no authority has been pointed out holding that such expert testimony is a necessity. At the same time, however, Defendants did present testimony from an expert witness who had significant familiarity with investment consulting for a client such the Pension Fund. Mr. Penter opined that the mere fact that Harris Bretall had failed to meet the rolling three-year benchmarks would not automatically dictate its termination. He testified that it would be appropriate to scrutinize the investment manager's work for a period of time, to see whether its performance might improve. Also, he emphasized that it would be important to know whether the manager had made any changes in its organization or investment practices which might have caused the poor performance. As to the decision not to recommend Harris Bretall's termination in May 2001, the Court found this testimony persuasive.

Haley did admit that he could have found other investment managers in the large cap growth group "who had better numbers" than Harris Bretall. [Trial Trans. Vol. IV at 601 (Testimony of Michael Haley) ]. However, he qualified this with the statement that it would be difficult to find another such investment manager who continuously had higher numbers. He pointed out that the Large Cap Growth managers' returns all varied from one quarter to the next. There was no manager whose returns had been consistently in the top quartile. The pool of managers eligible to replace Harris Bretall would be limited by any criteria imposed by the client, including a minimum amount of assets under management and minimum years of experience. *Id.* at 595 (Haley). Also, different large cap growth managers had varying investment strategies. Some were more conservative than others; a client would have to determine which investment strategy to choose. This would further narrow the pool of eligible candidates.

More importantly, however, the number of available investment managers in Mercer's Large Cap Growth Universe is largely irrelevant. Mercer could have found a qualified replacement for Harris Bretall—either from inside or outside its own pool of managers—at any time. The Trustees would have to pick the investment manager whose investment style or strategy best suited the objectives of the Pension Fund.

Further, the fact that Harris Bretall managed only approximately 12.5% of the Pension Fund's assets is important. The

Pension Fund had a very well diversified portfolio which contained a large cap value equity component (12.5%) which was benchmarked to the S & P 500 Value Index, a large cap core equity component (10%) which was benchmarked to the S & P 500 Index, other equity components, plus a low-risk fixed income component (40%). The Large Cap Growth fund was intended to be one of the riskier components, with a view toward the possibility of higher returns. Also, even though Harris Bretall had had very poor results in the fourth quarter of 2000 (losing 20.4% of its assets) and in the first quarter of 2001 (losing 23.9% of its assets), its history as a rebound performer was a relevant consideration in deciding to recommend continuing with Harris Bretall. Finally, in the fourth quarter of 2000 and the first quarter of 2001 the entire equity market declined. Almost one half of the capital losses Harris Bretall incurred in these two quarters was attributable to a general downturn in the equity markets, not to anything unique to Harris Bretall.

Plaintiffs further argue that Defendants' failure to recommend Harris Bretall's termination after May 2001 but before August 2002 was negligent. During the period from the second quarter of 2001 through the end of the first quarter of 2002 Harris Bretall's returns varied considerably from quarter to quarter: 8.2%, –23.7%, 16.9%, -.4%. While three of these quarters' returns ranked at or above the S & P Growth Index and qualified Harris Bretall for rankings above the mid-point in the Mercer Large Cap Growth Universe, the significant loss in the third quarter of 2001 and the big losses from the fourth quarter of 2000 and the first quarter of 2001 continued to put Harris Bretall near the bottom of the Universe for the rolling three year period. They also left Harris Bretall below the S & P Growth Index for the three year period.

Plaintiffs again argue that Harris Bretall's failure to meet the three year benchmarks, particularly after such a lengthy "wait and see" period, demanded that Mercer recommend Harris Bretall's termination. The Court agrees that the wait-and-see period could not last indefinitely, even if the manager's investment style had not changed. At some point the investment style itself may be the problem. Had Harris Bretall continued to sustain new large losses, the Court might well agree with Plaintiffs that Mercer waited too long to recommend a new, more conservative large cap growth manager. However, the new information for three of the four quarters was good in the sense that Harris Bretall outperformed other large cap growth managers and outperformed the S & P Growth Index.

The Court again concludes that Harris Bretall's failure to meet the three-year performance benchmarks did not itself mandate recommending Harris Bretall's termination. It was not unreasonable for Mercer to consider that in this most recent period, Harris Bretall had performed well in relation to other large cap growth managers and in relation to the S & P Growth Index. The 2001–2002 recession probably limited the availability of good investment alternatives. The three quarters which had had such a bad cumulative impact could not be undone; it was not unreasonable to take a forward-looking approach. In fact, ERISA requires consideration of "circumstances then prevailing." Again, it is important that Harris Bretall's portfolio was only a small part of the Pension Fund's assets; and it is important that the Trustees were fully informed of the status of the portfolio on a quarterly basis. The Court has no doubt that the Trustees knew where they stood. It is also relevant that after the Trustees resolved in February 2002 to have Mercer initiate a search for a new manager, the Trustees unilaterally

changed their minds and called off the search. This is an indication that the Trustees themselves had some reluctance to switch to a new manager.

For the foregoing reasons, the Court concludes that the evidence fails to prove by a preponderance that Defendants breached ERISA's standard of prudence.

### B. *Statute of Limitations*

Defendants have also argued that Plaintiffs' action is barred by ERISA's period of limitations. Although the Court has already found for Defendants on the merits, the period of limitations argument will also be considered.

■ Defendants bear the burden of demonstrating that the statute of limitations should operate to bar Plaintiffs' claims. *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 974 (11th Cir.2007).

ERISA contains the following period of limitations for actions alleging a breach of fiduciary duty. 29 U.S.C. § 1113 provides:

No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part [29 USCS §§ 1101 et seq.], or with respect to a violation of this part [29 USCS §§ 1101 et seq.], after the earlier of-

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Plaintiffs have not alleged any fraud or concealment on the part of Defendants, so that section of the statute is not at issue here.

■ ERISA's six-year period of limitations serves as a statute of repose for actions alleging breach of fiduciary duty; no action may be brought more than six years after the last violation constituting a breach. As the United States Court of Appeals for the Eleventh Circuit has noted, "[t]he six-year time period reflects Congress' determination to impress upon those vested with the control of pension funds the importance of the trust they hold. Thus, Congress evidently did not desire that those who violate that trust could easily find refuge in a time bar." *Brock v. Nellis*, 809 F.2d 753, 754 (11th Cir.1987).

■ However, the ERISA statute of limitations does not allow plaintiffs with actual knowledge of a breach to sit on their rights. ERISA requires plaintiffs with actual knowledge to bring suit within three years of learning of the breach. 29 U.S.C. § 1113. Courts have construed the "actual knowledge" requirement strictly; constructive knowledge is inadequate, rather, the plaintiff must have knowledge of the facts or transaction that constituted the breach in order to trigger the statute of limitations. *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir.1992). As the Eleventh Circuit has stated, "[t]o charge [plaintiff] with actual knowledge of an ERISA violation, it is not enough that he had notice that something was awry; he must have had specific knowledge of the actual breach of duty upon which he sues." *Brock*, 809 F.2d at 755.

In this case, Plaintiffs allege that Defendants committed several breaches of fiduciary duty from 2001–2002. The suit was brought in November 2006, well within the

six-year statute of limitations. Thus, the only statute of limitations that could bar Plaintiffs' action is the three-year limit that applies from the date of the plaintiff's actual knowledge of the violation. Defendants argue that this action is barred by the statute of limitations because the suit was filed more than three years after some of the Trustees had actual knowledge of the alleged breaches. Three current Trustees who testified at trial, Hotard, Ellis, and Boudreaux, were Trustees at the time of the alleged breaches of fiduciary duty by Defendants. Because these Trustees had knowledge of the alleged breaches, Defendants argue, the action should be barred by the statute of limitations even though Hotard, Ellis, and Boudreaux are not named Plaintiffs in the case.

Plaintiffs argue that the knowledge of other Trustees is irrelevant when considering the applicability of the ERISA statute of limitations. One of the named Plaintiffs in this case, Hightower, became a Trustee in March 2006 and filed suit within three years of learning of Defendants' alleged breaches of fiduciary duty. [Trial Trans. Vol. I at 22 (Testimony of Joseph Hightower)]. The other named Plaintiff, Ohler, joined the suit as a participant in the Fund and only became a Trustee in May 2008. *Id.* at 17 (Testimony of Walter Ohler). Plaintiffs argue that because the statute of limitations refers to the plaintiff's actual knowledge, application of the three-year statute of limitations based on the actual knowledge of current Trustees who are not plaintiffs is inappropriate.

Unfortunately, no circuit court has addressed whether the three-year statute of limitations serves to bar an action in a case such as this one. The few district courts that have confronted similar situations have, with one exception, declined to find that the statute of limitations was applicable. Thus, the case law on this particular issue is sparse. However, it does produce some principles that are helpful in reaching a resolution in this case.

1. *Relevant Law*

■ A lawsuit may be commenced against a fiduciary of a plan governed by ERISA for breach of fiduciary duty. 29 U.S.C. § 1132(a)(2). The suit may be brought by a participant, beneficiary, or fiduciary of the plan, or by the Secretary of Labor. *Id.* These parties can bring suit only on behalf of the plan, not in their individual capacities. *Landwehr v. DuPree*, 72 F.3d 726, 732 (9th Cir.1995); *see* 29 U.S.C. § 1109. Any recovery obtained through the lawsuit goes to the plan and the individual plaintiffs are not entitled to monetary damages. 29 U.S.C. § 1109; *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985). As a result, the pension or benefit plan is the real party in interest in any action alleging a breach of fiduciary duty.

However, the circuit courts of appeal have split on the question of whether pension or benefit plans have standing to bring suits for breach of fiduciary duty under ERISA, and therefore, whether they can be plaintiffs in such suits. *See, e.g., Pressroom Unions–Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889, 892–93 (2nd Cir.1983) (holding that ERISA does not authorize an employee benefit fund to bring suit for breach of fiduciary duty); *Saramar Aluminum Co. v. Pension Plan for Employees of the Aluminum Indus. & Allied Indus.*, 782 F.2d 577, 581–82 (6th Cir.1986) (allowing the Pension Plan to bring a counterclaim because the Plan, through its administrators, was a fiduciary for the purposes of § 1132(e)). The Eleventh Circuit has not ruled on this issue, making it unclear whether a plan such as the Pension Fund can be a plaintiff in this circuit.

Even though the employee benefit plan is the real party in interest in a suit for breach of fiduciary duty, some courts have focused on the actual knowledge of the named representative plaintiffs when determining if the statute of limitations bars the action. *See, e.g., Landwehr v. DuPree,* 72 F.3d 726, 732–33 (9th Cir.1995); *Mason Tenders Dist. Council Pension Fund v. Messera,* 958 F.Supp. 869, 882–83 (S.D.N.Y.1997); *Useden v. Acker,* 734 F.Supp. 978, 980 (S.D.Fla.1989). For example, in *Messera,* the court held that whether former trustees knew of the alleged breach of fiduciary duty was irrelevant; the trustees who had brought the lawsuit filed within three years of their knowledge of the breach, which is all that was required. 958 F.Supp. at 882. Similarly, in *District 65,* the court emphasized that it is only the actual plaintiff's knowledge that triggers the statute of limitations. 925 F.Supp. at 1559. Accordingly, the *District 65* court refused to impute the knowledge of former trustees to a successor trustee for statute of limitations purposes. *Id.*

■■ However, courts addressing the ERISA statute of limitations period have made clear that manipulation of the statute of limitations should not be tolerated. *See Librizzi v. Children's Mem'l Med. Ctr.,* 134 F.3d 1302, 1307 (7th Cir.1998) (refusing to start the statute of limitations on the date that the deferred effect of the breach of fiduciary duty occurred because to do so "would destroy the structure of the statute, which gives participants the shorter of two periods"); *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.,* 919 F.2d 1216, 1221 (7th Cir.1990) ("While it is not uncommon for parties to cast the same set of facts in such a way that they amount to a claim that is not time-barred rather than one that is, we are reluctant to read § 1113 as encouraging this practice."). In addition, the United States Court of Appeals for the First Circuit has cautioned that, when determining whether a plaintiff had actual knowledge or merely constructive knowledge, willful blindness to a violation should not be permitted. *Edes v. Verizon Comm'ns, Inc.,* 417 F.3d 133 (1st Cir.2005).

### 2. *Application in this case*

■■ As this review of the case law indicates, no case is entirely on point with the facts in the instant case. Here, the Pension Fund Trustees who are Plaintiffs brought suit within three years of learning of the alleged breaches of fiduciary duty. However, there are current Trustees who had contemporaneous knowledge of the alleged breaches but did not join this suit as Plaintiffs. Thus, Plaintiffs have been able to avoid the three-year actual knowledge statute of limitations through careful selection of the named plaintiffs. Defendants contend that this is an impermissible manipulation of the statute of limitations. The Court agrees.

The Fund is the real party in interest in this case. Through the Trustees, the Fund had contemporaneous knowledge of the alleged breaches of fiduciary duty. Nine of the ten Trustees were present at the May 31, 2001 meeting, which is when Plaintiffs allege Mercer should have recommended Harris Bretall's termination. The minutes from that meeting reflect that Haley discussed Harris Bretall's poor performance with the Trustees. [Pls.' Exh. 18 at 5, 6]. Specifically, Haley informed the Trustees that "approximately half of the ($44) million domestic equity investment loss during the last six months was due to Harris Bretall's poor performance." *Id.* at 5. In addition, Haley told the Trustees that Harris Bretall was not performing well against its peers. *Id.* at 6.

One of the nine Trustees present at the May 31, 2001 meeting was Sid Hotard, who testified at trial but is not a named Plaintiff in this case. *See id.* at 1. Hotard attended at least eight of the Trustees'

monthly meetings from March 2001–October 2002. *See* [Pls.' Exhs. 18, 19, 21, 23, 24, 25, 26, and 28]. Between seven and ten Trustees attended each of the meetings at which the quarterly performance reports were presented. *See* [Pls.' Exhs. 18, 19, 21, 24, 25, and 26]. At each of the quarterly meetings, Haley presented the quarterly performance reports and reviewed them with the Trustees. [Trial Trans. Vol. I at 42–43, 93–95; Vol. II at 113, 133, 150–51]. Therefore, all of the facts presented at trial regarding Harris Bretall's performance and continued failure to meet its benchmarks were made known to the Trustees at the quarterly meetings.

As a result, the Fund, through its Trustees, had knowledge of the alleged fiduciary breaches as they were occurring. The three-year statute of limitations should commence when the alleged breaches occurred, because that is when the Fund had knowledge of them through the vast majority of its Trustees. Starting the limitations period when the later-appointed Trustees learned of the alleged breaches of fiduciary duty is a manipulation of the statute of limitations. Under the facts of this case, allowing the statute of limitations period to be controlled by the knowledge of the named Plaintiffs, when the Fund had contemporaneous knowledge of the alleged breaches, is an artifice. Although the Court has already resolved this case in Defendants' favor on the merits, the Court further concludes that Plaintiffs' action is barred by the ERISA statute of limitations.

## III. *Conclusion*

The Court has carefully reviewed the parties' filings and considered their arguments. The claim against Defendant Dickson is DISMISSED WITH PREJUDICE pursuant to the parties' agreement. The Court concludes that Defendants Haley and Mercer Investment Consultants did not breach their fiduciary duty to Plaintiffs and that Plaintiffs' claims are barred by ERISA's period of limitations. Accordingly, judgment is entered in Defendants' favor, with costs taxed to Plaintiffs.

SO ORDERED.